IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


SWANSON V. SWANSON


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


SUMMER N. SWANSON, NOW KNOWN AS SUMMER N. MASHEK, APPELLANT,

V.

MICHAEL L. SWANSON, APPELLEE.


Filed April 6, 2021.    No. A-20-613.


Appeal from the District Court for Box Butte County: TRAVIS P. O'GORMAN, Judge. Affirmed.

Lori A. Browning, of Sorensen, Hahn, Browning & Judy, P.C., for appellant.

Rebecca R. Chasek, of Douglas, Kelly, Ostdiek, Snyder, Ossian, and Vogl, P.C., for appellee.


PIRTLE, Chief Judge, and ARTERBURN and WELCH, Judges.

PIRTLE, Chief Judge.

## INTRODUCTION

Summer N. Swanson, now known as Summer N. Mashek, appeals from an order entered by the district court for Box Butte County denying her complaint to modify custody and parenting time of her and Michael L. Swanson's child. Summer has not presented any assignments of error as required by Neb. Ct. R. App. P. § 2-109(D)(1)(e) (rev. 2014); therefore, we review only for plain error. Finding none, we affirm.

## BACKGROUND

Summer and Michael were married in 2005. They are the parents of Zekyel, born in 2011. The parties became his foster parents in July 2012 and adopted him in December 2017. In March 2018, the district court entered a decree of dissolution incorporating the parties' agreed upon

- 1 -

parenting plan which awarded the parties joint legal and physical custody of Zekyel. Physical custody rotated on a week on/week off basis.

In August 2019 Summer filed a complaint to modify custody and visitation and to remove Zekyel from the jurisdiction. The complaint requested that she be awarded primary legal and physical custody and sought permission of the court to remove Zekyel on a permanent basis to Georgia. Michael filed an answer objecting to a change in custody and removal.

Trial was held on Summer's complaint. Because Summer does not contest the denial of her request to remove Zekyel from the jurisdiction, we set forth only the relevant evidence presented at trial in regard to Summer's request to modify custody.

Zekyel is a child with Down syndrome. He also has a pacemaker, and vision and hearing issues. He has significant emotional, physical, and developmental needs. Although he was 8 years old at the time of trial, his mental capacity was that of a 2- or 3-year-old child. Language is one of his bigger delays. He attends school and has an Individual Education Plan (IEP) to address his educational needs. Summer works as a paraprofessional in the same school as Zekyel. At the time of trial, she worked in the same classroom as Zekyel but she was not his paraprofessional.

Zekyel has a team of doctors that he sees at Children's Hospital in Denver, Colorado, to address his needs. He has frequent medical appointments. The evidence demonstrates that both parents have done a good job learning to address Zekyel's needs. Summer has taken Zekyel to the majority of his medical appointments and also handles most aspects of his schooling. Michael has attended some medical appointments but claims his employment prevents him from attending most of the time. The Children's Hospital in Denver is a 4-hour drive from Alliance, Nebraska. Summer misses work to take Zekyel to his medical appointments or to care for Zekyel when he is sick. Between August 2019 and March 2020, Summer took over 254 hours of unpaid leave to take Zekyel to medical appointments or to care for him when he was sick.

Summer testified that she was requesting a change to the agreed upon joint custody arrangement because it does not provide Zekyel the stability and routine that he needs. Both parties agreed that structure is important for Zekyel and that he needs to know what is going to come next in his daily schedule or he gets upset and acts out.

Zekyel's teacher agreed that Zekyel needs structure and stability. She testified that Zekyel gets upset when someone else picks him up from school other than who he was expecting. She testified that during Michael's weeks of parenting time, the person picking up Zekyel varies day by day. Zekyel's teacher further testified that she believes Michael provides the basic needs for Zekyel, but that she does not see the extra effort from him that a special needs child requires. She noted that Michael had missed multiple meetings related to Zekyel's schooling as well as parent teacher conferences, whereas Summer had not missed any.

At the time of trial, both parties lived in Alliance. Michael was employed as an engineer for Burlington Northern Santa Fe Railroad, where he had worked for 16 years. At the time of the parties' divorce in March 2018, Michael was working an overnight shift where he would work 5 nights in a row and then have 2 nights off. He worked that schedule for 7 months and then got "knocked off of it." In the fall of 2018, he started working what he called an "extra board," which meant he went to work whenever he got called, day or night. He had no advance notice of when he would get called in to work. Michael worked the "extra board" from the fall of 2018 to January 2020, when he was "knocked off" that job and was forced into another job where he had to travel

to several locations. Michael went back to working the "extra board" job in May 2020, about a month before trial. He testified that he typically works 60 to 80 hours per week.

Michael testified that one of the reasons for the agreed upon week on/week off parenting schedule was because of his employment. He testified that throughout the parties' marriage and when they adopted Zekyel, his work schedule was unpredictable. In other words, the unpredictability of his job has not changed since the divorce and was something the parties had dealt with for years during their marriage. Summer also testified that the parties agreed to a week on/week off schedule in an attempt to provide more stability for Zekyel. She testified that when the parties first separated they did not have a set parenting schedule due to Michael's uncertain and long work hours. Summer testified that the parties started using a week on/week off arrangement after they separated at the suggestion of Zekyel's caseworker as a way of making the parenting time for each party more certain.

Summer claims that the week on/week off schedule has not changed the instability of each party's parenting time. She stated that Michael still works a lot and his work hours are uncertain so Michael is not always the one to pick up Zekyel from school or to care for him during Michael's weeks of custody.

Michael testified that he relies on his parents, Summer's parents, or Summer to take care of Zekyel while he is working during his weeks of custody. He also has his girlfriend and his sister-in-law help with Zekyel at times. Michael testified that in the mornings when he has custody of Zekyel, he explains to him that he might have to go to work and will not be able to pick him up from school.

Following trial the court denied Summer's motion to remove the child from the jurisdiction and her motion to modify custody and visitation. In regard to custody, the court found that Summer had not met her burden to show that there was a material change in circumstances to support modifying the joint legal and physical custody arrangement the parties stipulated and agreed to. It stated that the parties entered into an agreement knowing full well that adjustments would be necessitated by Michael's employment.

ASSIGNMENTS OF ERROR

Summer's brief fails to set forth a specific section assigning errors.

STANDARD OF REVIEW

Parties who wish to secure appellate review of their claims must abide by the rules of the Nebraska Supreme Court. *Wilson v. Wilson*, 23 Neb. App. 63, 867 N.W.2d 651 (2015). Any party who fails to properly identify and present its claim does so at its own peril. *Id.*

Section 2-109(D)(1)(d), (e), and (f) of the Rules for Appellate Practice requires a separate section for assignments of error, designated as such by a heading, and also requires that the section be located after a statement of the case and before a list of controlling propositions of law. *Wilson v. Wilson, supra*. The rule requires that the assignments of error section include a separate and concise statement of each error the party contends was made by the trial court. *Id.* Each assignment of error shall be separately numbered and paragraphed, bearing in mind that consideration of the case will be limited to errors assigned and discussed. *Id.*

Summer's brief does not contain a separate assignments of error section. Rather, her "Summary of Argument" section of her brief, as well as the subheadings of her "Argument" section, state how the court erred. The Supreme Court has repeatedly held that assignments of error consisting of headings or subparts of the argument section do not comply with the mandate of § 2-109(D)(1)(e). *Steffy v. Steffy*, 287 Neb. 529, 843 N.W.2d 655 (2014); *In re Interest of Jamyia M.*, 281 Neb. 964, 800 N.W.2d 259 (2011). In addition, the "Summary of Argument" section is a separate required section from the assignments of error section. See § 2-109(D)(1)(h).

Where a party fails to comply with the court rules requiring a separate section setting forth the assignments of error, an appellate court may proceed as though the party failed to file a brief entirely or, alternatively, may examine the proceedings for plain error. *Wilson v. Wilson, supra.* The decision to proceed on plain error is at the discretion of the appellate court. *Id.* We choose to review the record for plain error. Plain error is error plainly evident from the record and of such a nature that to leave it uncorrected would result in damage to the integrity, reputation, or fairness of the judicial process. *Id.*

## ANALYSIS

The premise of Summer's argument on appeal is that the district court should have found a material change in circumstances existed to support modification of custody and that it was in Zekyel's best interests to modify custody.

Custody of a minor child will not be modified unless there has been a material change of circumstances showing that the custodial parent is unfit or that the best interests of the child require such action. *State on behalf of Savannah E. & Catilyn E. v. Kyle E.*, 21 Neb. App. 409, 838 N.W.2d 351 (2013). Prior to the modification of a child custody order, two steps of proof must be taken by the party seeking the modification. First, the party seeking modification must show a material change in circumstances, occurring after the entry of the previous custody order and affecting the best interests of the child. *Eric H. v. Ashley H.*, 302 Neb. 786, 925 N.W.2d 81 (2019). In cases involving the modification of child custody, a material change of circumstances constituting grounds for modification means the occurrence of something which, had it been known to the dissolution court at the time of the initial decree, would have persuaded the court to decree differently. See *Fichtl v. Fichtl*, 28 Neb. App. 380, 944 N.W.2d 516 (2020). Next, the party seeking modification must prove that changing the child's custody is in the child's best interests. *Eric H. v. Ashley H., supra.* The party seeking modification of child custody bears the burden of demonstrating a material change in circumstances occurring after the entry of the earlier custodial order which affects the best interests of the children. *Id.*

Both parties agree that the other is a fit parent. The record demonstrates that both parties love Zekyel and have a good relationship with him. They both understand his needs as a child with Down Syndrome and take proper care of him.

The evidence shows that Michael's job complicates his parenting time, but that is not a material change in circumstance. This circumstance was known to the parties and to the court at the time of the initial decree. Summer agreed to joint legal and physical custody knowing what Michael's work schedule was like and that adjustments would be necessary. Michael testified that one of the reasons for the agreed upon week on/week off parenting schedule was because of his

employment. Summer also testified that the parties agreed to a week on/week off schedule in an attempt to provide stability for Zekyel due to Michael's work schedule.

Even though Michael's work schedule requires him to make arrangements with others to help care for Zekyel while he is working, he spends time with Zekyel every week. He continues to be a good father and actively parents Zekyel with the help of his family members and Summer's family members. Further, the individuals that Michael relies on to help him with Zekyel all have a good relationship with Zekyel. Michael also testified that he tries to prepare Zekyel for the possibility that he might not be the one to pick him up from school.

Further, Zekyel's need for stability and routine is also nothing new. He was born with Down Syndrome and has always had special needs. He can get upset and act out when his schedule gets disrupted, but there was no evidence that his behavior has gotten any worse since the decree was entered. Although his teacher testified that he gets upset when someone other than who he is expecting picks him up from school, she did not indicate that his behavior has changed or has been escalating on those occasions.

The court found that Summer had not met her burden to show that there was a material change in circumstances to support modifying the joint legal and physical custody arrangement the parties stipulated and agreed to. It stated that the parties entered into an agreement knowing full well that adjustments would be necessitated by Michael's employment. We find no plain error in the district court's findings.

CONCLUSION

The district court did not plainly err in leaving intact the parties' joint legal and physical custody of Zekyel. Therefore, the district court's order is affirmed.

AFFIRMED.